**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ROBERT ANTHONY HOUSE,
*Defendant-Appellant.*

No. 20-30169

D.C. No.
1:19-cr-00096-SPW-1

OPINION

Appeal from the United States District Court
for the District of Montana
Susan P. Watters, District Judge, Presiding

Submitted November 10, 2021[*]
Portland, Oregon

Filed April 15, 2022

Before: Susan P. Graber and Morgan Christen, Circuit
Judges, and George H. Wu,[**] District Judge.

---

[*] The panel unanimously concluded this case was suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

[**] The Honorable George H. Wu, United States District Judge for the Central District of California, sitting by designation.

Per Curiam Opinion;
Concurrence by Judge Graber;
Concurrence by Judge Christen;
Concurrence by Judge Wu

## SUMMARY[***]

### Criminal Law

The panel affirmed in part, reversed in part, and remanded for resentencing in a case in which Robert Anthony House pleaded guilty to being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and (g)(3).

At sentencing, the district court ruled that two of House's prior felony convictions—a 2007 conviction under Montana Code Annotated § 45-9-103 for criminal possession of dangerous drugs with intent to distribute ("2007 marijuana conviction") and a 2013 conviction under Montana Code Annotated §§ 45-2-302 and 45-9-101 for accountability as to criminal distribution of dangerous drugs ("2013 cocaine conviction")—qualified as "controlled substance offenses" under USSG § 4B1.2(b). The district court, in turn, applied the enhancement in USSG § 2K2.1(a)(2).

The panel accepted the government's concession that *United States v. Bautista*, 989 F.3d 698 (9th Cir. 2021), is controlling as to the sentencing enhancement based on the 2007 marijuana conviction, and that this court should

---

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

remand for resentencing without treating the marijuana conviction as a qualifying offense.

As to whether the 2013 cocaine conviction is a qualifying prior controlled substance offense, House raised two arguments.

House first argued that "the plain language of the § 4B1.2 guideline and commentary definition of a controlled substance offense does not include offers to engage in prohibited conduct," while Montana's accountability statutes do, rendering the latter categorically overbroad. Because it was bound by *United States v. Crum*, 934 F.3d 963 (9th Cir. 2019) (per curiam), the panel held that although Montana's accountability statutes include offers to engage in prohibited conduct, they are not rendered categorically overbroad with respect to §§ 4B1.2(b) and 2K2.1(a).

House argued, second, that Montana's drug statute is categorically overbroad because its definition of cocaine includes substances that are either not set forth in the federal definition and/or are specifically excluded. Because House raises new arguments on appeal, the panel reviewed the district court's sentencing calculation for plain error as to those contentions. The panel observed (1) that when the district court reached its decision that a cocaine conviction under Montana Code Annotated §§ 45-9-101 and 50-32-224(1)(d) could constitute a controlled substance offense under § 4B1.2(b), there was no (and there still is no) binding precedent to the contrary; and (2) that certain of the grounds for the district court's rulings were not rejected in binding precedent until after its sentencing decision. The panel concluded, accordingly, that the district court did not commit plain error with respect to the cocaine overbreadth issue.

Concurring, Judge Graber wrote separately to explain her views concerning overbroad state statutes. She noted that the general rule is that a state law cannot be considered broader than a federal law if the state law's breadth is imagined or theoretical. In her view, this court has distinguished between overbreadth that is "evident" from the statute's text, when a defendant may rely on the statutory language to establish the statute as overly inclusive, and overbreadth that is not "evident" from the text, when the party arguing for overbreadth must find a relevant case establishing a realistic probability of overbroad application.

Concurring, Judge Christen wrote separately because the complicated categorical approach has proven inordinately time consuming, and this court's prior consideration of Montana's cocaine statute may result in confusion regarding the methodology set forth in *Taylor v. United States*, 495 U.S. 575 (1990). She wrote that, in her view, the categorical approach employed in *United States v. Holliday*, 853 F. App'x 53 (9th Cir. 2021), skipped an important step by taking the holdings from *United States v. Grisel*, 488 F.3d 844 (9th Cir. 2007) (en banc), *abrogated on other grounds as recognized by United States v. Stitt*, 139 S. Ct. 399 (2018), and *United States v. Bautista*, 989 F.3d 698 (9th Cir. 2021), out of context.

Concurring, District Judge Wu wrote separately to specifically address the categorical/modified categorical analysis as it relates to the cocaine overbreadth issue in the context of Montana Code Annotated § 50-32-224(1)(d). He would apply the reasonable probability factor articulated in *Gonzales v. Duennas-Alvarez*, 549 U.S. 183 (2007), as further considered in *Moncrieffe v. Holder*, 569 U.S. 184 (2013), in initially determining whether the definition of

cocaine in § 50-32-224(1)(d) is a categorical match with the federal regulatory definition at 21 C.F.R. § 13-08.12(b)(4).

## COUNSEL

Evangelo Arvanetes, Assistant Federal Defender; Anthony R. Gallagher, Federal Defender; Federal Defenders of Montana, Billings, Montana; for Defendant-Appellant.

Karla E. Painter, Assistant United States Attorney; Leif M. Johnson, sActing United States Attorney; United States Attorney's Office, Billings, Montana; for Plaintiff-Appellee.

## OPINION

PER CURIAM:

On January 23, 2020, Robert Anthony House pleaded guilty to two counts of being a "prohibited person" in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and (g)(3).[1]  At sentencing on August 5, 2020, the district court ruled that two of his prior felony convictions—a 2007 conviction under Montana Code Annotated section 45-9-103 for criminal possession of dangerous drugs (*i.e.*, marijuana[2])

---

[1] Title 18 U.S.C. § 922(g)(1) prohibits a convicted felon from possessing a firearm.  Title 18 U.S.C. § 922(g)(3) bars such possession by a person "who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802))."

[2] The Montana criminal statutes use both spellings, *i.e.*, "marijuana" and "marihuana," for that controlled substance.  *See, e.g.*, Montana Code

with intent to distribute ("2007 marijuana conviction") and a 2013 conviction under Montana Code Annotated sections 45-2-302 and 45-9-101 for accountability as to criminal distribution of dangerous drugs (*i.e.,* cocaine) ("2013 cocaine conviction")—qualified as "controlled substance offenses" under United States Sentencing Commission Guidelines Manual ("USSG") § 4B1.2(b). Over House's objections, the court applied the sentencing enhancement in USSG § 2K2.1(a)(2). House appeals. We affirm in part, reverse in part, and remand for resentencing.

## I.   APPLICABLE LAW

For context, we provide a brief overview of the convoluted law that has developed concerning the issues raised in this appeal.

USSG § 2K2.1(a)(2) assigns a base offense level of 24 to a defendant convicted under 18 U.S.C. § 922(g) if the defendant has previously sustained at least two felony convictions of either a "crime of violence" as defined in USSG § 4B1.2(a) or a "controlled substance offense" as defined in § 4B1.2(b). If the defendant has only one such prior conviction, the base offense level is 20. *See* § 2K2.1(a)(4). If the defendant has none, the base level is 14. *See* § 2K2.1(a)(6). USSG § 2K2.1(a) does not define what constitutes a "controlled substance offense," but Application Note 1 of the Commentary to § 2K2.1 states that it "has the meaning given that term in § 4B1.2(b) and

---

Annotated section 50-32-101(18). Although both spellings are also found in various federal criminal statutes, in 21 U.S.C. § 802(16), which sets out a definition of the drug, it is spelled "marihuana."

Application Note 1 of the Commentary to § 4B1.2[.]" § 2K2.1 cmt. n.1.  In turn, § 4B1.2(b) states:

> The term "controlled substance offense" means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

Application Note 1 of the Commentary to § 4B1.2 expands the prohibited conduct by providing that "'controlled substance offense' include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."[3]

To determine whether a prior state conviction qualifies as a controlled substance offense for purposes of the federal Sentencing Guidelines, we apply a three-step analysis.  *See*

---

[3] Federal circuit courts are split as to whether Application Note 1's expansion of the types of prohibited conduct that can constitute a controlled substance offense lacks legal force because it goes beyond the text of USSG § 4B1.2(b) itself.  *See United States v. Crum*, 934 F.3d 963, 966 (9th Cir. 2019) (per curiam) (collecting cases).  In *Crum*, we held that we were "compelled by our court's prior decision in *United States v. Vea-Gonzales*, 999 F.2d 1326 (9th Cir. 1993), *overruled on other grounds by Custis v. United States*, 511 U.S. 485 (1994), to [conclude] . . . that Application Note 1 of § 4B1.2 is 'perfectly consistent' with the text of § 4B1.2(b) . . . . [and] that Application Note 1 properly interprets the definition of the term 'controlled substance offense' to encompass aiding and abetting, conspiracy, attempt, and other forms of the underlying offense."  934 F.3d at 966-67.

*United States v. Martinez-Lopez*, 864 F.3d 1034, 1038 (9th Cir. 2017) (en banc); *United States v. Figueroa-Beltran*, 892 F.3d 997, 1001 (9th Cir. 2018). "First, we ask whether the state law is a categorical match with a federal drug trafficking offense." *Martinez-Lopez*, 864 F.3d at 1038 (citing *Taylor v. United States*, 495 U.S. 575, 599–600 (1990)). In this initial step,

> we look only to the "statutory definitions" of the corresponding offenses. [*Taylor*, 495 U.S.] at 600. If a state law "proscribes the same amount of or less conduct than" that qualifying as a federal drug trafficking offense, then the two offenses are a categorical match. *United States v. Hernandez*, 769 F.3d 1059, 1062 (9th Cir. 2014) (per curiam). In that scenario, a conviction under state law automatically qualifies as a predicate drug trafficking offense—ending our analysis.

*Martinez-Lopez*, 864 F.3d at 1038; *see also Crum*, 934 F.3d at 964. The categorical-match analysis typically focuses on one or both of the following subjects: (1) the criminal conduct necessary for the state trafficking conviction (*i.e.*, the actus reus requirements), *see, e.g.*, *United States v. Rivera-Sanchez*, 247 F.3d 905, 908–09 (9th Cir. 2001) (en banc) (comparing California's statute criminalizing the transportation of marijuana, which included solicitation offenses, with the federal Controlled Substances Act, which at that time did not), *superseded on other grounds as recognized in Martinez-Lopez*, 864 F.3d at 1038; or (2) the types or varieties of the substance that fall within the definition of the outlawed drug (*i.e.*, the scope of the designated controlled substances), *see, e.g.*, *United States v.*

*Bautista*, 989 F.3d 698, 704–05 (9th Cir. 2021) (comparing an Arizona criminal statute that included hemp in its definition of marijuana with the federal Controlled Substances Act, which was amended in 2018 to exclude hemp from the federal definition of marijuana).

If there is not a categorical match, we proceed to the second step and consider whether the state statute is "divisible"—*i.e.*, whether it "sets out one or more elements of the offense in the alternative." *Martinez-Lopez*, 864 F.3d at 1038 (quoting *Descamps v. United States*, 570 U.S. 254, 257 (2013)). "A single statute may list elements in the alternative, and thereby define multiple crimes." *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016).

If there is not a categorical match but the state statute is divisible, we proceed to the third step of the analysis and apply the modified categorical approach, where we examine judicially noticeable documents of conviction "to determine which statutory phrase was the basis for the conviction." *Descamps*, 570 U.S. at 263 (quoting *Johnson v. United States*, 559 U.S. 133, 144 (2010)). If the defendant pleaded to (or was found guilty of) the elements that constitute a federal drug trafficking crime, "the prior state conviction may serve as a predicate offense under the sentencing guidelines." *Martinez-Lopez*, 864 F.3d at 1039.

The Supreme Court has identified an additional factor for courts to consider in the categorical/modified categorical analyses. In *Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007), the Court stated:

> [I]n our view, to find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires more than the application of legal

imagination to a state statute's language. It requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime. To show that realistic probability, an offender, of course, may show that the statute was so applied in his own case. But he must at least point to his own case or other cases in which the state courts in fact did apply the statute in the special (nongeneric) manner for which he argues.

*Id.* at 193. We have applied the *Duenas-Alvarez*'s holding on several occasions. *See, e.g.*, *United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1150 (9th Cir. 2020) (concluding that California's statute prohibiting possession for sale of both the geometric and optical isomers of methamphetamine was not categorically overbroad—even though the federal statute outlaws only possession of methamphetamine's optical isomers—because there was "unrebutted expert testimony . . . that there is no such thing as a geometric isomer of methamphetamine"); *United States v. Perez*, 932 F.3d 782, 788–89 (9th Cir. 2019) (holding that a California statute criminalizing intentional use of physical force that results in serious bodily injury was a crime of violence even though the defendant found two state appellate decisions that "dream[ed] up unusual scenarios" in which a non-violent act could conceivably inflict substantial bodily injury (alterations in original) (internal quotation marks omitted)), *cert. denied*, 140 S. Ct. 2723 (2020).

## II. BACKGROUND

The government recommended a base offense level of 24 under USSG § 2K2.1(a)(2) because House had two prior felony convictions for controlled substance offenses under § 4B1.2(b). In his sentencing memorandum, House argued that his 2007 marijuana conviction did not qualify as a "controlled substance offense" within § 4B1.2(b) because the Montana statute criminalized more conduct than its federal analogue. Specifically, the federal definition of marijuana was amended in 2018 to expressly exclude hemp, whereas the Montana statute does not contain that exclusion. *Compare* 21 U.S.C. § 802(16), *with* Montana Code Annotated section 50-32-101(18). House also asserted that his 2013 cocaine conviction was not a controlled substance offense for two reasons. First, he argued that the Montana accountability statutes (*i.e.*, Montana Code Annotated sections 45-2-302, 45-9-101[4]) included aiding, abetting, and solicitation, which goes beyond the text of USSG § 4B1.2(b). Second, House appeared to make a scope-of-the-controlled-substance argument, though his contention in this regard is difficult to decipher.

At sentencing, as to the 2007 marijuana conviction, the district court ruled: (1) 21 U.S.C. § 802(16) was amended in

---

[4] At the time of House's sentencing, Montana Code Annotated section 45-2-302(3) provided in relevant part: "[a] person is legally accountable for the conduct of another when: . . . either before or during the commission of an offense with the purpose to promote or facilitate the commission, the person solicits, aids, abets, agrees, or attempts to aid the other person in the planning or commission of the offense." Montana Code Annotated section 45-9-101(1) stated: "a person commits the offense of criminal distribution of dangerous drugs if the person sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug[.]"

2018 to exclude hemp from the federal definition of marijuana; (2) Montana Code Annotated section 50-32-101(18) makes no such distinction; but (3) "because this change did not take place until 2018, House was not subject to greater criminal liability in 2007 when he was convicted of his marijuana felony." Additionally, the district court held that Montana Code Annotated section 50-32-101 was a "divisible statute" for purposes of applying the modified categorical approach, citing *Coronado v. Holder*, 759 F.3d 977, 984 (9th Cir. 2014). The court concluded that, although "a defendant, possessing solely hemp, could be convicted of criminal possession of marijuana under Montana law but not under federal law," House had to "demonstrate more than a theoretical possibility that he faced greater criminal liability" to establish that his prior conviction was not a match, citing *Duenas-Alvarez*, 549 U.S. at 193. The court further stated that "House not only failed to provide any Montana cases imposing criminal liability for possession of hemp, but the judicially noticeable facts described in the underlying documents . . . establish that House plead[ed] guilty to possession of marijuana, a substance still included in the [Controlled Substances Act ("CSA")], not possession of hemp." The district court held that House's 2007 marijuana conviction was a predicate offense for purposes of the sentencing enhancement under USSG § 2K2.1(a).

As to the 2013 cocaine conviction, the district court rejected House's first argument (*i.e.*, that Montana's accountability statute swept in more conduct than its federal counterpart) because that contention had been rebuffed in cases considering other similar state statutes, citing *Crum*, 934 F.3d at 965–66. Turning to House's second contention (*i.e.*, whether Montana's "accountability criminal distribution of dangerous drugs – cocaine – [was] a controlled substance offense"), the district court held:

(1) that reference should be made to federal regulatory definitions in making the comparison, and (2) in *United States v. Holliday*, No. CR 18-118-BLG-SPW, 2020 WL 814030 (D. Mont. Feb. 19, 2020) ("*Holliday I*"), it had "recently determined the issue of whether Montana's definition of cocaine fits the federal definition and determined that it is a categorical match."

The district court applied the USSG § 2K2.1(a)(2) enhancement, which set the base offense level at 24 and resulted in a Guidelines advisory range of 70 to 87 months' imprisonment. The Government recommended a 72-month sentence; House requested 27 to 33 months; and the court, after weighing the aggravating and mitigating circumstances, varied downward and sentenced him to 48 months.

After House filed his opening brief, we stayed this appeal pending the resolution of *United States v. Bautista*, No. 19-10448 (9th Cir. Feb. 26, 2021), because that case raised two issues that were germane here: (1) whether a marijuana conviction under Arizona Revised Statutes section 13-13405(A)(4) could constitute a controlled substance offense as defined in USSG § 4B1.2(b) following the removal of hemp in 2018 from the definition of marijuana in the CSA, and (2) whether, in comparing the defendant's prior state conviction with the federal law, a court uses the CSA and corresponding Guidelines in existence at the time of the federal sentencing or, instead, the federal counterpart in existence at the time of the defendant's underlying state conviction. *Bautista* held:

> At federal sentencing, the district judge was required to compare the elements of the state crime as they existed when Bautista was convicted of that offense to those of the crime

as defined in federal law at the time of federal sentencing—that is, after the Agriculture Improvement Act removed hemp from the federal drug schedule. Because the federal CSA excludes hemp but Section 13-3405 of the Arizona Revised Statutes did not, the latter crime's "greater breadth is evident from its text." *See* [*United States v.*] *Vidal*, 504 F.3d [1072,] 1082 [(9th Cir. 2007)]. Bautista's conviction is facially overbroad and not a categorical match for a "controlled substance offense," and the district court erred in applying the recidivist sentencing enhancement for a controlled substance.

*Bautista*, 989 F.3d at 705.

Shortly thereafter, we reversed and remanded the district court's decision in *Holliday I*. *See United States v. Holliday*, 853 F. App'x 53 (9th Cir. 2021) ("*Holliday II*"). Relying on *Bautista*, *Holliday II* held that Montana's definition of cocaine is broader than the federal counterpart. *Id.* at 54–55.

## III.  DISCUSSION

We review de novo a district court's interpretation of the Sentencing Guidelines, and its application of the Guidelines to the facts of the case generally for abuse of discretion. *See United States v. Ayala-Nicanor*, 659 F.3d 744, 746 (9th Cir. 2011). "A district court abuses its discretion when it errs in its Guidelines calculation, imposes a sentence based on clearly erroneous facts, or imposes a substantively unreasonable sentence." *United States v. Burgos-Ortega*, 777 F.3d 1047, 1052 (9th Cir. 2015). Where a defendant proffers on appeal a sentencing issue that was not raised before the district court, we review for plain error. *See*

*United States v. Depue*, 912 F.3d 1227, 1232 (9th Cir. 2019) (en banc); Fed. R. Crim. P. 52(b).

## A.  The 2007 Marijuana Conviction

The Government admits that Montana's definition of marijuana is substantially similar to the Arizona definition we considered in *Bautista*.  The Government also "concedes that *Bautista* is controlling as to House's first argument regarding his marijuana conviction," and agrees with House that "this Court should remand for resentencing" without treating House's marijuana conviction as a qualifying offense.  We accept the government's concession, reverse the district court's application of the sentencing enhancement based on House's 2007 marijuana conviction, and remand for resentencing.  *Cf. United States v. Halamek*, 5 F.4th 1081, 1091 (9th Cir. 2021) (accepting Government's concession as to sentencing error and remanding for resentencing).

## B.  The 2013 Cocaine Conviction

As to whether his 2013 cocaine conviction is a qualifying prior controlled substance offense, House raises two arguments: (1) "the plain language of the § 4B1.2 guideline and commentary definition of a controlled substance offense does not include offers to engage in prohibited conduct," while Montana's accountability statutes do, rendering the latter categorically overbroad ("accountability overbreadth"); and (2) Montana's drug statute is categorically overbroad because its definition of cocaine includes substances that are either not set forth in the federal definition and/or are specifically excluded ("cocaine overbreadth").

1)  Accountablity Overbreadth

House points out that the conduct specifically delineated in USSG § 4B1.2(b) covers only "the manufacture, import, export, distribution, or dispensing of a controlled substance" or the possession thereof with such intent; whereas the Montana statutes (*i.e.*, sections 45-2-302 and 45-9-101) include a person who "sells, barters, exchanges, gives away, or offers to sell, barter, exchange, or give away any dangerous drug."  House argues that Application Note 1 of the Commentary to § 4B1.2 improperly expands the prohibited conduct to "include the offenses of aiding and abetting, conspiring, and attempting to commit such offenses."

But as House recognized in both his sentencing memorandum to the district court and in his opening brief here, in *Crum*: (1) we "acknowledged that the commentary to § 4B1.2 does not mention solicitation, even though it expands the definition of 'controlled substance offense' to include aiding and abetting, conspiring, and attempting to commit such an offense," and held that "the definition of 'controlled substance offense' in § 4B1.2 [nevertheless] encompasses solicitation offenses," 934 F.3d at 965; and (2) we declined to reconsider our holding in *Vea-Gonzales* that Application Note 1 of the Commentary to § 4B1.2 is "perfectly consistent" with the text of § 4B1.2(b), *Crum*, 934 F.3d at 966.  Because we are bound by *Crum*, we hold that although Montana's accountability statutes include offers to engage in prohibited conduct, they are not rendered categorically overbroad with respect to USSG §§ 4B1.2(b) and 2K2.1(a).

### 2) Cocaine Overbreadth

As to House's cocaine overbreadth contention, he raises new arguments on appeal that he did not present to the district court. In his opening brief, House asserts that "[t]he federal statutory definition of cocaine and the State of Montana statutory definition of cocaine differ, and the State of Montana's definition is broader."[5]  But in his sentencing memorandum to the district court, House made different and more limited arguments.

Because House did not raise his current arguments at sentencing, we review the district court's sentencing calculation for plain error as to those contentions. *See United States v. Wijegoonaratna*, 922 F.3d 983, 991 (9th Cir. 2019). The first two elements under that analysis are: (1) "an error that has not been intentionally relinquished or abandoned," and (2) the error is plain—"that is to say, clear or obvious."[6]  *Rosales-Mireles v. United States*, 138 S. Ct.

---

[5] Montana Code Annotated section 50-32-224(1)(d) defines cocaine as including derivatives of cocaine. The CSA's definition of cocaine at 21 U.S.C. § 812(c) Schedule II(a)(4) excludes derivatives. The applicable federal regulation, 21 C.F.R. § 1308.12(b)(4), includes derivatives but excludes [$^{123}$I]ioflupane, which is a cocaine derivative. Thus, the Montana statutory definition of cocaine is broader than both the CSA definition and the federal regulatory definition.

[6] The third element of plain error review requires a showing that the error affects substantial rights of the defendant, which ordinarily means establishing "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (internal quotation marks omitted). "In most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Id.* at 200.

1897, 1904 (2018) (quoting *Molina-Martinez*, 578 U.S. at 194). "An error cannot be plain where there is no controlling authority on point and where the most closely analogous precedent leads to conflicting results." *Wijegoonaratna*, 922 F.3d at 991 (quoting *United States v. De La Fuente*, 353 F.3d 766, 769 (9th Cir. 2003)). The question is whether the district court plainly erred when it held that House's 2013 cocaine conviction pursuant to Montana Code Annotated sections 45-9-101 and 50-32-224(1)(d) was a controlled substance offense as set forth in USSG § 4B1.2(b). We conclude that it did not.

First, applying the categorical approach, the court must determine whether the Montana statutory definition of cocaine is a match with federal law. As we have explained, under federal law, cocaine is defined by both statute and regulation, and the Montana definition is broader than either federal definition. 21 U.S.C. § 812(c) Schedule II(a)(4) does not expressly include cocaine derivatives within its definition (although it does expressly reference ecgonine derivatives). *See* footnote 5, *supra*. 21 C.F.R. § 1308.12(b)(4) expressly *includes* cocaine (and ecgonine) derivatives, but also expressly *excludes* [123I]ioflupane. Montana Code Annotated section 50-32-224(1)(d) expressly includes cocaine derivatives but does not expressly exclude or mention [123I]ioflupane.

When the district court reached its decision that a cocaine conviction under Montana Code Annotated sections 45-9-101 and 50-32-224(1)(d) could constitute a controlled substance offense under § 4B1.2(b), there was no (and there still is no) binding precedent to the contrary.[7] House was

_____

[7] *Holliday II*—which held that the Montana schedules as to cocaine "are facially overbroad when compared with both the federal statutory

sentenced on August 5, 2020.  At that time, the only case to have considered the issue was the unpublished decision in *United States v. Lasalle*, 758   F. App'x 410 (9th Cir. 2019), which held that it was not plain error for a court to look to the federal regulatory definition of cocaine (which during the relevant period was purportedly a categorical match with the Montana statute) and concluded that the defendant's prior conviction under Montana Code Annotated sections 45-9-101 and 50-32-224(1)(d) fell within § 4B1.2(b).  *See id.* at 411–12.

Second, certain of the grounds for the district court's rulings were not rejected in binding precedent until after its sentencing decision.  For example, the district court had (as had many other federal courts) compared the elements of the state conviction with the federal law that existed at the time of the state sentencing, rather than the federal statutes and guidelines that existed at the time of the federal sentencing. *See, e.g.*, *Martinez v. Attorney General*, 906 F.3d 281, 287 (3d Cir. 2018) (holding that, although 21 C.F.R. § 1308.12(b)(4) currently expressly exempts [[123]I]ioflupane from the list of schedule II substances, the court uses the list at the time of the defendant's prior state conviction, which had not yet added that exclusion).  *Bautista* overturned that approach and held, "In imposing a sentence, the district court must consider the sentencing guidelines range 'that . . . [is] in effect on the date the defendant is sentenced.' 18 U.S.C. § 3553(a)(4)(A)(ii)."   989 F.3d at 703 (alterations in original).

---

schedules and the federal regulatory schedules" and, thus, the cocaine conviction therein was not a controlled substance offense—was issued on March 3, 2021 and was unpublished.  853 F. App'x at 54 n.1.

Accordingly, the district court did not commit plain error with respect to the cocaine overbreadth issue when it held that House's 2013 cocaine conviction was a controlled substance offense as set forth in USSG § 4B1.2(b).

## IV.   CONCLUSION

We reverse the district court's sentencing enhancement insofar as it rested on House's 2007 marijuana conviction and remand for resentencing.   But the district court's determination that House's 2013 cocaine conviction was a qualifying prior controlled substance offense for purposes of the § 4B1.2(b) sentencing enhancement was not plainly erroneous.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**

---

GRABER, Circuit Judge, concurring:

I concur in the per curiam opinion but write separately to explain my views concerning overbroad state statutes.  In my view, we have distinguished between overbreadth that is "evident" from the statute's text and overbreadth that is not "evident" from the text.

The general rule is that a state law cannot be considered broader than a federal law if the state law's breadth is imagined or theoretical; in other words, the overbreadth must be real.  *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007) ("[T]o find that a state statute creates a crime outside the generic definition of a listed crime in a federal statute requires *more than the application of legal imagination* to a state statute's language.  It requires a

realistic probability, *not a theoretical possibility*, that the State would apply its statute to conduct that falls outside the generic definition of a crime." (emphasis added)).

But we have applied that rule in two ways. "[W]hen the state statute's greater breadth is *evident from its text*, a defendant may rely on the statutory language to establish the statute as overly inclusive." *United States v. Vidal*, 504 F.3d 1072, 1082 (9th Cir. 2007) (en banc) (internal citations and quotation marks omitted) (emphasis added), *abrogated on other grounds as recognized in United States v. Bautista*, 989 F.3d 698, 704 (9th Cir. 2021); *see also United States v. Grisel*, 488 F.3d 844, 847 (9th Cir. 2007) (en banc) ("[When a] state statute explicitly defines a crime more broadly than the generic definition, *no legal imagination*[] is required to hold that a realistic probability exists that the state will apply its statute to conduct that falls outside the generic definition of the crime. The state statute's greater breadth is *evident* from its text." (internal citations and quotation marks omitted) (emphasis added)), *abrogated on other grounds by United States v. Stitt*, 139 S. Ct. 399 (2018).

When the state law's overbreadth is not "evident from its text," the party arguing for overbreadth must find a relevant case establishing a "realistic probability" of overbroad application. *See Vidal*, 504 F.3d at 1082 ("In the absence of any case in which the state courts in fact did apply the statute in the special (nongeneric) manner, *this argument failed for lack of evidence* that such an application of the state statute was a realistic probability [and] not a theoretical possibility."(internal citations and quotation marks omitted) (emphasis added)).

It is under that framework that we decided *United States v. Bautista*, 989 F.3d 698 (9th Cir. 2021). In *Bautista*, we held that the state law was overbroad. The state law

criminalized both attempted transportation of hemp and attempted transportation of marijuana; but the federal law did not criminalize hemp at all.  Thus, because the state law's greater breadth was *evident from the text*, the state law barred more than the federal law.  *Id.* at 705.  For that reason, *Bautista* rested on the correct proposition that the state law's "greater breadth is evident from its text."  *Id.* (*quoting Vidal*, 504 F.3d at 1082).

In sum, *Duenas-Alvarez* expressed the general rule:  a state law's breadth in categorical-approach cases always must be realistically probable and cannot be theoretical or imagined.  549 U.S. at 193.  We have construed facially overbroad statutes as meeting that bar whenever the state statute's overbreadth is "evident from its text."  When a federal statute contains an express exception but the parallel state statute contains no such exception, the difference between them is "evident" from the text.  In that situation, no evidentiary examples are required to demonstrate a realistic probability of prosecution.  Put another way, when a state law prohibits "X" and a federal law prohibits "X except Y is not included," it is "evident" from the text that the state statute is overbroad, so it is not necessary to find a case demonstrating that the state prosecutes "Y."

---

CHRISTEN, Circuit Judge, concurring:

I

The government concedes that House's prior marijuana conviction should not count as a "controlled substance offense" in the calculation of House's sentencing guidelines range, and I agree that the district court did not plainly err in determining that his prior cocaine-related offense did

qualify. But, shortly after the district court ruled, our court suggested in an unpublished decision that Montana's definition of cocaine is categorically overbroad. *See United States v. Holliday*, 853 F. App'x 53 (9th Cir. 2021) ("*Holliday II*"). In my view, *Holliday II*'s categorical analysis skipped an important step by taking the holdings from *United States v. Grisel*[1] and *United States v. Bautista*[2] out of context.

I write separately because the complicated categorical approach has proven inordinately time consuming—for district courts and for circuit courts—and our court's prior consideration of Montana's cocaine statute may result in confusion regarding the correct *Taylor*[3] methodology. The *Holliday II* majority concluded that: (1) Montana's definition of cocaine is "facially overbroad" because it includes a substance expressly excluded from the federal counterpart; and (2) the "varieties of cocaine" included in Montana's drug schedules are "alternative means of committing a single crime, not alternative elements of separate crimes." 853 F. App'x at 54–55. The *Holliday II* majority stopped short of considering whether there is "a realistic probability, not a theoretical possibility,"[4] that Montana would apply its definition of cocaine to conduct that falls outside the federal definition. *See Holliday II*, 853 F. App'x at 54–55. Rather than engaging in this inquiry, *Holliday II* prematurely ended its analysis after concluding

---

[1] 488 F.3d 844 (9th Cir. 2007) (en banc), *abrogated on other grounds as recognized by United States v. Stitt*, 139 S. Ct. 399 (2018).

[2] 989 F.3d 698 (9th Cir. 2021).

[3] *Taylor v. United States*, 495 U.S. 575 (1990).

[4] *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007).

that the "overbreadth" of Montana's statute was "evident from its text." *Id.* (quoting *Bautista*, 989 F.3d at 705).

## II

The first step in the *Taylor* categorical approach requires us to compare the elements of the state statute with those in the federal counterpart to determine whether the state statute sweeps in more conduct or, as in House's case, criminalizes more controlled substances, than the federal definition. *See United States v. Martinez-Lopez*, 864 F.3d 1034, 1038 (9th Cir. 2017). Even when there is a mismatch between the state and federal statutes, *Duenas-Alvarez* teaches that to find the state statute categorically broader than its federal counterpart "requires a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." 549 U.S. at 193.

Soon after the Supreme Court decided *Duenas-Alvarez*, our en banc court in *Grisel* considered whether Oregon's burglary statute was a categorical match to the generic offense. The Supreme Court had defined the federal offense to require unlawful entry into, or remaining in, "a building or structure[] with intent to commit a crime." *Grisel*, 488 F.3d at 848 (quoting *Taylor*, 495 U.S. at 599). Oregon's burglary statute starkly differed from the federal offense because it defined "building" to include "any booth, vehicle, boat, aircraft or other structure adapted for overnight accommodation of persons or for carrying on business therein." *Id.* at 850 (quoting Or. Rev. Stat. § 164.205(1)). *Grisel* went on to recognize that the Oregon legislature had "consciously defined" burglary to be broader than the federal definition "by extending the statute to non-buildings," *id.*, and cited Oregon case law that pinpointed the legislature's express intent to sweep in more conduct, *id.* at 850 n.4. Under those circumstances—and consistent with *Duenas-*

*Alvarez*—we concluded "[t]he state statute's greater breadth is evident from its text," and "no 'legal imagination' is required to hold that a realistic probability exists that [Oregon would] apply its statute to conduct that falls outside the generic definition." *Id.* at 850 (citation omitted) (quoting *Duenas-Alvarez*, 549 U.S. at 193). *Grisel* does not stand for the proposition that *Taylor*'s categorical inquiry ends simply because a textual comparison of a state statute's elements shows the state statute sweeps more broadly than its federal counterpart.

Since *Grisel*, we have recognized a subset of cases addressing state statutes that only *impliedly* criminalize more conduct than their federal counterparts. Rather than including more conduct or controlled substances, these statutes do not contain an exclusion that appears in the corresponding federal law. *See, e.g.*, *United States v. Vega-Ortiz*, 822 F.3d 1031, 1035–36 (9th Cir. 2016); *United States v. Burgos-Ortega*, 777 F.3d 1047, 1054–55 (9th Cir. 2015). Cases involving statutes of this type are particularly relevant to House's appeal because, like Montana's definition of cocaine, they involve statutes that are silent about certain substances expressly *excluded* from the federal definition of a controlled substance. *See, e.g.*, *Vega-Ortiz*, 822 F.3d at 1036 (describing California's definition of methamphetamine as impliedly overbroad even though it does "not expressly *include* conduct not covered by the generic offense, but rather *is silent* as to the existence of a parallel [L-meth] exception.'" (alteration in original) (emphasis added) (quoting *Burgos-Ortega*, 777 F.3d at 1055)).

Where a state statute is only impliedly overbroad, our case law[5] requires that defendants identify "any case where a defendant was in fact prosecuted or convicted" for the impliedly included substance or conduct that the federal definition expressly excludes. *Burgos-Ortega*, 777 F.3d at 1054–55. This step determines whether the "theoretical possibility[] that the State would apply its statute to conduct that falls outside the generic definition" is a realistic one, as the Supreme Court required in *Duenas-Alvarez*. 549 U.S. at 193.

Two of our cases are illustrative. *Burgos-Ortega* involved a Washington state statute that criminalized, among other things, distribution of a controlled substance. *See* 777 F.3d at 1052. Washington's statute did not except "administering" from the definition of "distribution," but the federal counterpart did. *Id.* We rejected Burgos-Ortega's argument that the state statute was "overbroad on its face" merely because the state statute did not "expressly include conduct not covered by the generic [federal] offense, but rather [was] silent as to the existence of a parallel administering exception." *Id.* at 1055. Burgos-Ortega could not point "to any case where a defendant was in fact prosecuted or convicted for administering a drug under [the state] statute," and we upheld the district court's sentencing enhancement. *Id.*

A year later, we considered California's definition of methamphetamine in *Vega-Ortiz*. We first observed that California's definition was silent as to "L-meth," a substance the federal definition expressly excluded. *See Vega-Ortiz*, 822 F.3d at 1035–36. Citing *Burgos-Ortega* and *Duenas-Alvarez*, we held that "to succeed on his claim[,] Vega-Ortiz

---

[5] *Holliday II* was not published. *See* 853 F. App'x at 53.

would need to show a 'realistic probability' that he would be prosecuted under [the state statute] for possession of the [federally] excluded product containing L-meth." *Id.* at 1036.

Like House's case, *United States v. Holliday*, 853 F. App'x 53 (9th Cir. 2021) ("*Holliday II*"), concerned Montana's definition of cocaine. *Holliday II* explained that Montana's statute impliedly includes "ioflupane" because it makes no mention of that substance and ioflupane is expressly excluded from the federal definition. *Id.* at 54. At step one, *Holliday II* recognized the textual mismatch between the state and federal definitions. *Id.* So far, so good. But after the judicially noticeable documents showed only that Holliday's prior conviction was for selling "cocaine," the majority tripped up by concluding it was "evident from [the] text" of the Montana statute that the state definition of cocaine is "facially overbroad," and ending its analysis.[6] *Id.* at 54–55 (quoting *Bautista*, 989 F.3d at 705).[7]

---

[6] Judge Watford's dissent in *Holliday II* recognized the disconnect between the *Holliday II* majority's conclusion and our precedent. His dissent reasoned that Montana's cocaine statute is the same type that was at issue in *Vega-Ortiz* and *Burgos-Ortega* and that Montana's definition is overbroad "only if [a defendant shows] there is a realistic probability of prosecution under Montana law for distribution of Ioflupane." 853 F. App'x at 56.

[7] The *Holliday II* majority may have relied on a sentence from *Lopez-Aguilar v. Barr*, 948 F.3d 1143 (9th Cir. 2020), which, if read literally, suggests "the relative likelihood" that a state would apply its statute to "nongeneric conduct is immaterial," *Holliday II*, 853 F. App'x at 55. That reading would be plainly inconsistent with *Duenas-Alvarez*. *Lopez-Aguilar* and the case it cited, *United States v. Valdivia-Flores*, 876 F.3d 1201 (9th Cir. 2017), involved statutes that were akin to the one at issue in *Grisel*, where "no 'legal imagination' [was] required" to

To be sure, there are statutes like the burglary statute at issue in *Grisel* where courts will have occasion to decide a state law is so starkly overbroad that "no legal imagination is required to hold that a realistic probability exists" the state would apply its definition to a substance (or conduct) falling outside of the generic definition. 488 F.3d at 850 (citations omitted). But *Grisel* only required our court to recognize that Oregon would apply its burglary statute to the unlawful entry into vehicles, boats, or aircraft where the legislature had expressly defined "building" to include vehicles, boats, and aircraft. *See* 488 F.3d at 850. Given that circumstance, it was indeed evident from the text of the statute that Oregon would actually prosecute, as burglary, the unlawful entry into vehicles, boats, or aircraft. Controlled substances statutes are much less intuitive. Indeed, absent a degree in pharmacology, it is doubtful there will be many judges in a position to accurately predict from the text of a controlled substances statute that a state would prosecute a particular controlled substance. *Cf. United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1151–53 (9th Cir. 2020) (concluding California's definition of methamphetamine was not categorically overbroad, even though it included "geometric isomers" and the federal definition did not, because "unrebutted expert testimony" demonstrated "geometric isomers of methamphetamine do not exist," so there was "no possibility of application of the state statute to nongeneric conduct" (internal quotation marks omitted)).

---

recognize a "realistic probability" that the state would apply its statute in the nongeneric manner, *id.* at 1208 (quoting *Grisel*, 488 F.3d at 850) (distinguishing the federal "mens rea requirement of specific intent" and Washington's requirement of "mere[] knowledge"); *Lopez-Aguilar*, 948 F.3d at 1146–47 (recognizing Oregon's definition of third-degree robbery allowed consensual takings by deception whereas the federal definition was limited to nonconsensual takings).

This is why, even when a state statute sweeps in more conduct or controlled substances, the complete *Taylor* analysis includes the reality check the Supreme Court introduced in *Duenas-Alvarez* to determine whether there is a realistic probability a state would prosecute the possession or distribution of a particular controlled substance. This step can be particularly illuminating in cases involving impliedly overbroad statutes. Expert testimony might establish that a realistic probability does not exist; or, where a substance has been removed from the federal schedule, the rationale relied on by the federal government may be informative.

One member of our panel would decide that the mismatch between Montana's definition of cocaine and the federal definition is "evident from the text" and end the analysis there. In my view, there are two problems with this approach. First, the nature of the categorical inquiry is such that any mismatch between the state and federal elements will always be evident from the text because the categorical approach requires that we identify the elements of the offense from the text of the state statute and compare them to those in the federal counterpart. Second, Supreme Court precedent requires that we consider whether there is a realistic probability the state would actually prosecute the overly broad portion of the statute. *See Duenas-Alvarez*, 549 U.S. at 193. My colleague treats this as one step, but in my view it is necessarily two because the textual comparison tells us only whether a state statute is overbroad; it tells us nothing about whether the state would realistically prosecute the substance (or conduct) included in the state statute.

A comparison of the elements of Montana's statute with those in the federal definition of cocaine shows that Montana's statute is impliedly broader because it does not exclude ioflupane. Step two requires consideration of

whether Montana would actually prosecute the distribution of ioflupane, a substance the Food and Drug Administration excepted from the federal definition because it is the active ingredient in a product that "itself presents no practical possibility of abuse, misuse, diversion or clandestine production."[8]

III

I agree that the plain error standard applies to our review of the district court's analysis of House's 2013 cocaine conviction, and the parties agreed that the district court's application of a sentencing enhancement based on House's 2007 marijuana conviction should be reversed. I therefore concur in the court's per curiam opinion.

WU, District Judge, concurring:

## I.   Introduction

I concur in the per curiam opinion but write separately to specifically address the categorical/modified categorical analysis as it relates to the cocaine overbreadth issue in the context of the applicable Montana statute, *i.e.*, Mont. Code Ann. § 50-32-224(1)(d). The area is hopelessly confused, and I suggest a modest solution. A brief overview of the law

---

[8] Schedules of Controlled Substances: Removal of [$^{123}$I]Ioflupane from Schedule II of the Controlled Substances Act, 80 Fed. Reg. 31521-01, 31523 (June 3, 2015). Ioflupane "is the active pharmaceutical ingredient . . . in DaTscan," which the FDA approved for use with "patients with suspected Parkinsonian syndromes." *Id.* at 31522–23. According to the FDA, "DaTscan itself presents no practical possibility of abuse, misuse, diversion or clandestine production." *Id.*

as to that analysis in regards to the definitions of cocaine is necessary and provided initially.

## II. An Issue Stemming from the Varying Federal Delineations of Cocaine

For purposes of the categorical/modified categorical analysis, the Ninth Circuit has interpreted the term "controlled substance" as used in USSG §§ 2K2.1(a) and 4B1.2(b) "to mean a substance listed in the Controlled Substances Act ('CSA'), 21 U.S.C. § 801 et seq." *United States v. Bautista*, 989 F.3d 698, 702 (9th Cir. 2021). "[C]onstruing the phrase in the Guidelines to refer to the definition of 'controlled substance' in the CSA—rather than to the varying definitions of 'controlled substance' in the different states—furthers uniform application of federal sentencing law, thus serving the stated goals of both the Guidelines and the categorical approach."[1]  *Id.* (citing to *United States v. Leal-Vega*, 680 F.3d 1160, 1167 (9th Cir. 2012), and *Taylor v. United States*, 495 U.S. 575, 589 (1990)).

---

[1] The goal of achieving a uniform application of federal sentencing law in this area is initially vitiated by fact that there is a split amongst the federal circuits as to whether the definition of "controlled substance" is limited to federal law (*i.e.*, the substances listed in the CSA) or whether the definition is based on relevant state law. *See Guerrant v. United States*, 142 S. Ct. 640 (2022) (Sotomayor, J., concurring in denial of certiorari) (observing that the Second and Ninth Circuits "have turned to federal law to define the term"; the First and Fifth Circuits "have not directly resolved the question, but have indicated agreement with that approach"; the Fourth, Seventh, Eighth and Tenth Circuits "define[] what qualifies as a 'controlled substance' based on relevant state law"; and the Sixth and Eleventh Circuits "have issued internally inconsistent decisions on the question."). *Id.* at 640 (citations omitted).

In determining the federal demarcation of a particular controlled substance, one initially examines the CSA—*i.e.*, 21 U.S.C. Chapter 13, Subchapter I. The CSA defines a "controlled substance" as "a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter [*i.e.*, 21 U.S.C. § 812]." 21 U.S.C. § 802(6). While various drugs are identified and listed in the schedules, the actual definitions and/or descriptions of the substances are delineated in a number of different locations within the CSA and not just within the schedules. *See*, *e.g.*, 21 U.S.C. § 812(c), Schedule I(c)(10) (listing "marihuana" as a Schedule I drug); 21 U.S.C. § 802(16) (containing a definition of "[t]he term 'marihuana'").

Additionally, 21 U.S.C. § 811(a) allows the United States Attorney General, pursuant to the rulemaking provisions of the Administrative Procedure Act (5 U.S.C. §§ 551–59), to "add to such a schedule or transfer between such schedules any drug or other substance" or "remove any drug or other substance from the schedules . . . ." *See also* 21 U.S.C. § 812(c) ("Schedules I, II, III, IV, and V shall, *unless and until amended pursuant to section 811 of this title* [21 U.S.C. § 811], consist of the following drugs or other substances, by whatever official name, common or usual name, chemical name, or brand name designated . . . ." (emphasis added, footnote omitted)). Therefore, in determining whether a particular drug or its variants are designated as federal controlled substances, one must also review the relevant regulations promulgated by the Attorney General. *See* 21 C.F.R. § 1308.02 ("Any term contained in this part shall have the definition set forth in section 102 of the Act (21 U.S.C. 802) or part 1300 of this chapter."). The Ninth Circuit has, on occasion, relied upon the federal regulatory definitions of controlled substances when

conducting a categorical analysis under *Taylor*. *See, e.g.*, *Coronado v. Holder*, 759 F.3d 977, 988 Appendix 1 (9th Cir. 2014) (In engaging in the categorical analysis to determine whether there was a match as to California law and the CSA, the panel made comparisons between the state statutes and the corresponding federal regulations in 21 C.F.R. §§ 1308.11–1308.15.).

Turning to the various definitions of cocaine involved in this case, it would appear that the Montana statutory definition of cocaine is broader than both the CSA definition (because the Montana statute includes derivatives of cocaine whereas the CSA does not), and the federal regulatory definition (because it does not specifically exclude [$^{123}$I]ioflupane[2]—which is a cocaine derivative—whereas 21 C.F.R. § 1308.12(b)(4) does).[3]  However, it would also

---

[2] [$^{123}$I]ioflupane is the active pharmaceutical ingredient in DaTscan, "a single-dose, injectable diagnostic radiopharmaceutical," which was approved for use by the Food and Drug Administration in January 2011. Schedules of Controlled Substances: Removal of [<123>I]Ioflupane From Schedule II of the Controlled Substances Act, 80 Fed. Reg. 31521-22 (June 3, 2015).  "[$^{123}$I]Ioflupane [was], by definition, a schedule II controlled substance because it is derived from cocaine, a schedule II substance, via ecgonine (a schedule II substance)." *Id.*

[3] Mont. Code Ann. § 50-32-224(1)(d) delineates the following substances:

> coca leaves and any salt, compound, derivative, or preparation of coca leaves, including cocaine and ecgonine and their salts, isomers, derivatives, and salts of isomers, and derivatives, and any salt, compound, derivative, or preparation of them that is chemically equivalent or identical with any of these substances, except that these substances do not include decocainized coca leaves or extraction of coca leaves,

appear that the CSA and the federal regulatory definitions of cocaine are likewise not a categorical match with each other. 21 U.S.C. § 812(c) Schedule II(a)(4) does not expressly include cocaine derivatives within its definition (although it does expressly reference ecgonine derivatives) nor does it expressly exclude [<sup>123</sup>]ioflupane. [In the original, superscript 123.] 21 C.F.R.

---

     which extractions do not contain cocaine or ecgonine
. . . .

The CSA at 21 U.S.C. § 812(c) Schedule II(a)(4) includes:

> coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph.

The applicable federal regulation, *i.e.*, 21 C.F.R. § 1308.12(b)(4), states:

> Coca leaves (9040) and any salt, compound, derivative or preparation of coca leaves (including cocaine (9041) and ecgonine (9180) and their salts, isomers, derivatives and salts of isomers and derivatives), and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances, except that the substances shall not include:
>
> > (i) Decocainized coca leaves or extraction of coca leaves, which extractions do not contain cocaine or ecgonine; or
> >
> > (ii) [<sup>123</sup>]ioflupane.

§ 1308.12(b)(4) expressly includes cocaine (and ecgonine) derivatives, but also expressly excludes [123I]ioflupane.

The Ninth Circuit has not yet determined whether "the definition of cocaine in the CSA, rather than the definition in the corresponding regulation, should be the controlling definition for the purposes of the *Taylor* analysis." *United States v. Lasalle*, 785 F. App'x 410, 412 (9th Cir. 2019); *see also United States v. Holliday*, 853 F. App'x 53, 54 n.1 (9th Cir. 2021) (noting the difference but not deciding whether the "federal statutory schedules" or the "federal regulatory schedules" are the "appropriate comparator" in regards to "cocaine-related substances."). There is also no precedent as to what a court should do in the context of the categorical analysis where the definition of a controlled substance in the CSA differs from the definition in the corresponding federal regulation.

In regards to cocaine, because the appropriate categorical analysis under *Taylor* will differ depending upon whether one compares the Montana statute with the CSA (where the overbreadth rests on Mont. Code Ann. § 50-32-224(1)(d)'s inclusion of cocaine derivatives in its definition) versus comparing the Montana statute with 21 C.F.R. § 1308.12(b)(4) (where the overbreadth arises from the latter's express exclusion of [123I]ioflupane), it is essential to select the appropriate comparator at the first step of the analysis. Given that: (1) the schedules of controlled substances in the CSA are to be updated annually, *see* 21 U.S.C. § 812(a); *Coronado*, 759 F.3d at 983; (2) the "drugs and other substances" designated in the schedules remain there "unless and until amended pursuant to section 811," 21 U.S.C. § 812(c); and (3) 21 U.S.C. § 811(a) authorizes the Attorney General to add, remove or transfer substances between the schedules, I would hold that—where

there is a difference in the delineation of a substance between the CSA and a subsequent regulation promulgated by the Attorney General—the latter controls for purposes of the categorical analysis.

### III. The Appropriate Procedure Where There Is Overbreadth as Between the Federal Definition of a Controlled Substance and the State Definition

In their concurrences, Judges Graber and Christen assert that, where there is overbreadth between the federal and state definitions of a controlled substance, the correct procedure (regarding whether and when one should consider the realistic probability factor from *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)) is dependent upon whether one characterizes the overbreadth as being "explicit/evident" versus "implied/implicit." I find that step ambiguous and unnecessary in regards to the differing articulations of cocaine in this case and would simply apply the *Duenas-Alvarez* realistic probability factor regardless.

First, where the issue arises from the differing delineations of a controlled substance in statutes and/or regulations, one is not engaged in the comparison of "the elements of the crime of conviction with the elements of the 'generic' version of the listed offense—*i.e.*, the offense as commonly understood." *Mathis v. United States*, 136 S. Ct. 2243, 2247 (2016). Thus, the reasoning and holdings of cases such as *United States v. Grisel*, 488 F.3d 844, 847 (9th Cir. 2007) (en banc), *abrogated on other grounds by United States v. Stitt*, 139 S. Ct. 399 (2018)—which employ the notion of a state law's overbreadth being evident or explicit from its text in that process—are not applicable here.

Second, in the context of comparing Mont. Code Ann. § 50-32-224(1)(d) with 21 C.F.R. § 1308.12(b)(4), the

resulting overbreadth arises *solely* because in 2015 the Attorney General expressly excepted [$^{123}$I]ioflupane from the regulatory delineation of cocaine. It is unclear on what basis one would characterize that particular overbreadth as being "evident," "explicit," "implied," or "implicit."

Third, the Attorney General has an annual opportunity to modify the definition of a particular drug in the CSA's schedules of controlled substances. The unintended consequence of the exercise of this authority may be the wholesale exclusion of prior convictions that were based upon the affected drug for purposes of USSG § 4B1.2(b), unless state legislatures immediately amend their definitions of the substance to conform with the new federal regulatory definition. The present case typifies the problem. There previously was a categorical match as to cocaine between the federal regulation and the Montana statute. However, in 2015, the Attorney General specifically excluded from that substance's description "[$^{123}$I]ioflupane"—the active pharmaceutical ingredient in a "single-dose, injectable diagnostic radiopharmaceutical for use in hospital settings with specialized gamma cameras" for treatment of patients with Parkinson disease where the drug "presents no practical possibility of abuse, misuse, diversion or clandestine production." 80 Fed. Reg. 31522-23. The *Taylor* categorical analysis's goal of uniform application of federal sentencing law would not be furthered in any way by a finding that prior state cocaine convictions are no longer "controlled substance offenses" merely because of the discrepancy created by 2015 amendment to the regulation.

Fourth, the Ninth Circuit has applied the *Duenas-Alvarez* realistic probability criterion in a similar situation where there was overbreadth between a state statutory definition of a drug and its federal analogue. *United States v. Rodriguez-*

*Gamboa*, 946 F.3d 548 (9th Cir. 2019) ("*Rodriguez-Gamboa I*"), involved a state statute (*i.e.*, Cal. Health & Safety Code § 11378) which prohibited possessing for sale any controlled substance that was "specified" in § 11055(d), which included "[m]ethamphetamine, its salts, isomers, and salts of its isomers." Cal. Health & Safety Code § 11033 provided that "the term 'isomer' includes optical and geometrical (diastereometric) isomers." *Id.* at 551–52. The federal statute also prohibited the possession for sale of "methamphetamine, including its salts, isomers, and salts of isomers," but stated that the "term 'isomer' means the optical isomer." *Id.* (referencing 21 U.S.C. §§ 802(14), 812 Schedule II(c), Schedule III(a)(3)). Citing to the state statutes' inclusion of geometrical isomers of methamphetamine which were not included in the federal statute, the defendant-appellee argued that the "textual distinction" ended the categorical analysis because the "state statute's greater breadth is evident from its text" and hence "no 'legal imagination' is required to hold that a realistic probability exists that the state will apply its statute to conduct that falls outside the generic definition of the crime." *Id.* at 552 (quoting *Grisel*, 488 F.3d at 850). In response, the Government asserted that "the geometric isomer of methamphetamine does not exist" and, citing to *Duenas-Alvarez*, argued that, despite the difference in the statutes' respective texts, it was still necessary to show "a realistic probability, not a theoretical possibility, that the State would apply its statute to [the alleged] conduct . . . ." *Id.* The panel in *Rodriguez-Gamboa I* agreed; but, because the district court had not resolved the factual issue of the existence of geometric isomers of methamphetamine, the matter was remanded for that limited purpose. *Id.* at 552–53.

Upon the return of case to the circuit, the panel made reference to the Supreme Court's indication in *Moncrieffe v. Holder*, 569 U.S. 184 (2013), that *Duenas-Alvarez*'s reasonable probability criterion should be applied *even where* there is a readily apparent overbreadth between the federal statute and its state counterpart. *See United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1153–54 (9th Cir. 2019). As stated in *Moncrieffe*:

> Finally, the Government suggests that our holding will frustrate the enforcement of other aggravated felony provisions, like §1101(a)(43)(C), which refers to a federal firearms statute that contains an exception for "antique firearm[s]," 18 U.S.C. §921(a)(3). The Government fears that a conviction under any state firearms law that lacks such an exception will be deemed to fail the categorical inquiry. But *Duenas-Alvarez* requires that there be "a realistic probability, not a theoretical possibility, that the State would apply its statute to conduct that falls outside the generic definition of a crime." 549 U.S., at 193. To defeat the categorical comparison in this manner, a noncitizen would have to demonstrate that the State actually prosecutes the relevant offense in cases involving antique firearms.

569 U.S. at 205–06.

In conclusion, I would apply the *Duenas-Alvarez*'s reasonable probability factor (as further considered in *Moncrieffe*) in initially determining whether the definition of cocaine in Mont. Code Ann. § 50-32-224(1)(d) is a

categorical match with its delineation in 21 C.F.R. § 1308.12(b)(4).